IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY M. HILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | No.  11 C 2144 |
| MARTHA JOHNSON, Administrator, General | ) | |
| Services Administration, | ) | Judge Virginia M. Kendall |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Anthony M. Hill ("Hill") filed suit against Defendant Martha Johnson, former Administrator of General Services Administration ("GSA") pursuant to Title VII of the Civil Rights Act of 1964, as amended by 42 U.S.C. § 2000e *et seq*.  Defendant was sued in her official capacity as the former Administrator and designated representative of GSA, a federal agency.  Plaintiff is a former employee of GSA who was terminated approximately one year after being hired as a program specialist in GSA's Federal Career Intern Program.  Plaintiff alleges GSA discriminated against him on the basis of his race and gender (Count I), and retaliated against him when he complained of the discrimination (Count II).  Defendants move for summary judgment on all counts of Plaintiff's complaint.  For the reasons discussed below, Defendant's motion for summary judgment is granted.

## STATEMENT OF MATERIAL UNDISPUTED FACTS[1]

---

[1] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Martha Johnson's Statement of Uncontested Facts have been abbreviated to "Def. 56.1 Ex. __, p. __."; citations to Anthony Hill's Statement of Additional Material Facts have been abbreviated to "Pl. 56.1 Ex. __, p. __."; citations to Anthony Hill's Response to Martha Johnson's Statement of Uncontested Facts have been abbreviated to "Pl. 56.1 Resp. ¶ __."; and citations to Martha Johnson's Response to Anthony Hill's Statement of Additional Facts have been abbreviated to "Def. 56.1 Resp. ¶ __."

Hill began his employment with GSA on May 12, 2008, as a program specialist in the GSA Federal Career Intern Program ("FCIP"). (Pl. 56.1 Resp. ¶ 1.)  The FCIP is a two-year program with a one-year probationary period. (*Id.* ¶ 2.)  Hill was hired as a non-targeted trainee, meaning that throughout the internship, he would rotate to various divisions of GSA and be assigned to a supervisor in each respective work area. (*Id.* ¶ 3.)  These supervisors would assign Hill work, monitor his progress, and provide feedback on his performance. (*Id.*)  Timothy Gabrish ("Gabrish") oversaw the FCIP, serving as the supervisor of record for rotational trainees like Hill. (*Id.* ¶ 4.)

## I.     Hill's EEO and MSPB Complaints

Soon after he began working at GSA, Hill told Gabrish that he believed he should have been hired by GSA at a GS-9 pay grade rather than a GS-7 because he had a master's degree.[2] (*Id.* ¶ 6.) Gabrish informed Hill that the grade levels were based on the position applied for as indicated in the job vacancy announcement, which was determined by human resources, not his group. (*Id.* ¶ 7.)  Hill subsequently filed an Equal Employment Opportunity ("EEOC") complaint and a Merit Systems Protection Board ("MSPB") claim concerning his pay grade. (*Id.* ¶ 5; Pl. 56.1 Resp. Ex. J.)  GSA and Hill entered into a settlement agreement, dated August 26, 2008, in which GSA retroactively compensated Hill at a GS-9 pay grade.[3] (Pl. 56.1 Resp. ¶ 8.)

## II.    Hill's Altercations with Co-Workers

---

[2] The GS or "General Schedule" classification and pay system covers the majority of civilian white-collar federal employees in professional, technical, administrative, and clerical positions.  The General Schedule has 15 grades–GS-1 (lowest) to GS-15 (highest).  Agencies establish the grade of each job based on the level of difficulty, responsibilty, and qualifications required.  Individuals with master's degrees and no additional experience generally qualify for GS-9 positions. U.S. OFFICE OF PERSONNEL MANAGEMENT, http://www.opm.gov/oca/pay/html/gsclassandpay.asp (last visited Sep. 5, 2012).

[3] Hill's August 2008 settlement with GSA is unrelated to the EEOC complaint that lead to Hill filing this suit. The August 2008 complaint concerned Hill's pay grade as an FCIP intern.  The EEOC complaint Hill filed subsequent to his termination alleges race, gender, and age discrimination.

### A.    Fall 2008 Altercation Between Hill and Dwayne Thomas

In his first rotation assignment, Hill reported to Bruce Hall ("Hall"), branch manager of the Communications and Technology Capital Asset Management Branch ("Communications Group"). (*Id.* ¶ 9.) Dwayne Thomas ("Thomas"), a team leader in the Communications Group, provided Hill with assignments and served as his mentor. (*Id.*)

Sometime in September or October 2008, Hill was involved in an altercation with Thomas. (*Id.* ¶¶ 10-11, 13; Def. 56.1 Resp. Ex. D.) The incident began when Hill approached Thomas's cubicle to ask why he had not been selected by Thomas for certain training opportunities. (Pl. 56.1 Resp. ¶ 10.) Thomas felt threatened by Hill's demeanor, which he described as "loud and aggressive," and ordered Hill to step back and leave his cubicle. (*Id.* ¶ 13.) Later that day, Thomas called Hill into a conference room to discuss the incident. (Def. 56.1 Resp. ¶ 4.) After their discussion, Thomas believed he and Hill had resolved the dispute. (*Id.* ¶ 5.)

Thomas eventually discussed the incident with Hall, who met with Hill to inform him that his behavior toward Thomas was inappropriate. (Pl. 56.1 Resp. ¶ 14; Pl. 56.1 Resp. Ex. B, p. 4.)[4] Hall subsequently told Gabrish of the altercation, and informed Gabrish that he told Hill his behavior was not acceptable. (Pl. 56.1 Resp. ¶ 16; Def. 56.1 Ex. B, pp. 38, 40.)[5] Gabrish thought the

_____

[4]The plaintiff disputes this fact, asserting that Thomas never informed Hall of the incident. (Pl. 56.1 ¶ 3.) Bruce Hall's affidavit (Pl. 56.1 Resp. Ex. B, p. 4), however, affirmatively states that Hall met with Thomas to discuss the incident between Thomas and Hill. To support his contrary assertion, plaintiff cites Thomas's affidavit (Def. 56.1 Ex. D.), which is silent with regard to whether he spoke with Hall about the incident. The plaintiff has apparently taken Thomas's failure to mention a conversation with Hall as evidence that the conversation did not occur. In light of the contrary evidence in Hall's affidavit, the Court rejects this negative inference. While this Court draws all inferences in favor of the non-moving party, an adequate rebuttal of a supported assertion of fact requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001).

[5]Again, the plaintiff disputes this fact by way of negative inference. Plaintiff, citing Hall's deposition, asserts that Hall never stated he informed Gabrish of Hill's incident with Thomas as support. (Pl. 56.1 ¶ 7; Pl. 56.1 Resp. Ex. B, p. 4-5.) This is inadequate to rebut a supported assertion of fact. Gabrish's deposition, cited by the defendant,

altercation between Hill and Thomas may have been the result of a personality conflict, and decided to rotate Hill to his next assignment to see how things went. (Pl. 56.1 Resp. ¶ 17.) Hill's probationary evaluation, which was signed by Gabrish on November 11, 2008, was satisfactory and did not mention the incident with Thomas. (Def. 56.1 Resp. ¶ 28; Pl. 56.1 Ex. I, GSA 231-35.)

### B. March 2009 Incident Between Hill and Marcy Nordahl

In March 2009, Hill was rotated from the Communications Group to the Customer Projects Division ("Customer Projects"). (Pl. 56.1 Resp ¶ 18.) There, Hill worked on census team initiatives under the supervision of Christine McKenna ("McKenna"). (*Id.*) When Hill was transferred, John Siegel ("Siegel"), the Deputy Director of Customer Projects, asked Gabrish about Hill. (Def. 56.1 Resp. ¶ 19.) Gabrish told Siegel that Hill had issues with other managers. (*Id.* ¶ 21.) Gabrish also informed Siegel about Hill's MSPB-EEO complaint and the settlement that raised Hill from a GS-7 pay grade to a GS-9. (*Id.*)

Shortly after his transfer, Hill was involved in a verbal confrontation with Marcy Nordahl ("Nordahl"), a manager in the central supply service area ("CSS"). (Pl. 56.1 Resp. ¶ 19.) The dispute began when Hill went to CSS to request color copies of individual FedEx air bills. (*Id.* ¶ 19; Def. 56.1 Ex. F; Def. 56.1 Ex. A, pp. 59-61.) Nordahl asked Hill to come back in a few hours because CSS was extremely busy with other copy requests. (Pl. 56.1 Resp. ¶ 20.) When Hill returned, Nordahl informed him that she had discussed his request with the acting team manager, Katrina Trimble, and that she would not grant Hill's request because color copying was unnecessary and

---

specifically states that Hall informed Gabrish of the altercation. (Def. 56.1 Ex. B, p. 38, 40.) Since the defendant's assertion is supported by the record, the plaintiff must do more than simply point to the testimony of another witness who was silent with regard to that assertion.

costly. (*Id.* ¶ 21; Def. 56.1 Ex. F.)  Hill responded to Nordahl in a loud and aggressive tone,[6] yelling

that she "had no right to put him on report."[7] (*Id.* ¶ 22; Def. 56.1 Ex. F.)  Nordahl responded that she

had not put Hill on report. (Pl. 56.1 Resp. ¶ 22; Def. 56.1 Ex. F.)  Hill told Nordahl, "respectfully,

you did put me on report" and walked out. (Pl. 56.1 Resp. ¶22; Def. 56.1 Ex. F.)  Nordahl reported

the incident to Siegel, who did not speak with Hill or investigate the matter further.  (Pl. 56.1 Resp.

¶ 39; Def. 56.1 Resp. ¶¶ 24-25.)  Instead, Siegel complained directly to Gabrish about Hill's behavior

and that Hill was bragging about receiving back pay due to his settlement with the EEO. (Def. 56.1

Resp. ¶ 26.)  No further action was taken by GSA at that time.  Hill received two evaluations in April

2009: (1) a Customer Projects Division evaluation panel summary, which was signed by Siegel on

April 8, 2009; and (2) a probationary evaluation, which was prepared by McKenna. (*Id.* ¶¶ 29-30;

Pl. 56.1 Ex. I, GSA 345-46.)  Neither evaluation mentioned the incidents with Thomas and Nordahl.

(Def. 56.1 Resp. ¶ 29; Pl. 56.1 Ex I, GSA 345-46.)


## C.    April 2009 Altercation Between Hill and Kristina Wallig

One month after the incident with Nordahl, Hill was involved in a third altercation with

Kristina Wallig ("Wallig"), a fellow intern. (Pl. 56.1 Resp. ¶ 23.)  The incident began when Wallig

approached Hill at his desk and requested certain lease procurement files. (*Id.*)  Wallig used an

---

[6]Hill denies that he yelled at Nordahl and states that he used a conversational tone. (Pl. 56.1 Resp. ¶ 22.)
However, Hill offers no evidence to support his version of events other than his own deposition.  While the Court will
construe all facts in the light most favorable to the mon-moving party, "[s]elf-serving affidavits without factual support
in the record will not defeat a motion for summary judgment." *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir.
2001) (quoting *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293 (7th Cir. 1993)).

[7]"Putting someone on report," according to Hill, is an expression used in the military to describe the act of
setting another individual up to get in trouble. (Def. 56.1 Ex. A, p. 60.)

unpleasant tone, which caught Hill off guard. (*Id.* ¶ 24; *Def 56.1 Ex. G, pp. 12-13.*)  Hill became

flustered, raised his voice, and informed Wallig that he had already returned the files to the central

filing area.  (Pl. 56.1 Resp. ¶ 24.)  Wallig also raised her voice and told Hill she would go find the

files herself. (*Id.* ¶ 25.)  After their exchange, Wallig left Hill's cubicle and walked toward the

central filing area.  (*Id.*).  After briefly speaking with a co-worker about the files, Hill also went to

central filing. (*Id.* ¶¶ 26-27.)  He arrived there shortly after Wallig, who by then had completed a file

request and asked for assistance with locating the files. (*Id.* ¶27.)  Hill confronted Wallig in the

central filing area and expressed that he did not appreciate being spoken to in a condescending tone

in front of coworkers. (*Id.* ¶ 28.)  During the confrontation, Hill brought his face close to Wallig's

and yelled at her in front of the other employees in central filing. (*Id.* ¶ 31.)  Wallig ignored Hill, but

felt physically threatened by the confrontation.  (*Id.* ¶¶ 29, 31.)

After leaving the central filing area and returning to her desk, Wallig wrote an e-mail to her

acting supervisor, Katrina Trimble.  (*Id.* ¶ 32.)  Wallig stated in the e-mail that Hill was very upset

with her, and that she could hear Hill stomping around the office and slamming doors. (Pl. 56.1 Ex.

I, GSA 224.)  Wallig also mentioned that Hill had "not directed his physical anger toward [her]

(aside from a few loud words) . . . ." (*Id.*)  Trimble forwarded the e-mail to McKenna, Wallig and

Hill's actual supervisor. (Pl. 56.1 Resp. ¶ 32.)  Since McKenna was out of the office that day, she

called Hill and Wallig and spoke with each of them separately. (*Id.* ¶ 33.).  McKenna then scheduled

a conference call with both Hill and Wallig for the following day. (*Id.*)  Hill and Wallig met in a

conference room the next day and called McKenna to discuss the incident and how each of them

could have handled the situation differently. (*Id.* ¶ 34)  During the call, Wallig apologized to Hill for

her tone of voice. (*Id.* ¶ 35.)

McKenna reported the incident to Siegel, who later followed up with Hill and Wallig separately to find out what happened. (*Id.* ¶ 36.) During his conversation with Hill, Siegel told Hill that he was a "big guy" and could intimidate others by the way he carried himself. (*Id.* ¶ 37.) Siegel, whose office was across the hall from Hill's cubicle, cited the noise from the door being slammed and Hill stomping around the office as examples. (*Id.* ¶¶ 37-38.) After the meeting, Siegel informed Gabrish of the incident and told Gabrish that something needed to be done about Hill. (*Id.* ¶ 40; Def. 56.1 Resp. ¶ 26.)

### III.   Hill's Termination

Gabrish, concerned that Hill had lost his temper three times in less than 12 months in two separate GSA departments, decided to speak with Human Resources ("HR") and the legal department ("Legal"). (Pl. 56.1 Resp. ¶ 41.) Gabrish met with Tamara Adams ("Adams"), a labor relations officer, to discuss the incidences where he believed Hill had acted inappropriately. (*Id.* ¶ 42.) Adams told Gabrish that she needed documentation, including witness statements, in order to understand the details of what had transpired between Hill and his coworkers. (*Id.* ¶ 43.) Gabrish forwarded to Adams several e-mails drafted by the individuals with whom Hill had confrontations. (*Id.* ¶ 44.) No one in HR or Legal met with Hill or requested a written version of events from him before determining that he should be terminated. (Def. 56.1 Resp. ¶ 33.) After reviewing the documentation, and upon further discussion, Adams and Gabrish agreed that Hill's removal was appropriate. (Pl. 56.1 Resp. ¶ 45.) Adams considered the fact that Hill had engaged in unprofessional and threatening behavior while on probation. (*Id.* ¶ 46.) Legal concurred with the decision to terminate Hill. (*Id.* ¶ 45.)

7

On May 7, 2009, Gabrish presented Hill with a written notice of his termination for inappropriate conduct during the probationary one-year trial period. (*Id.* ¶ 47; Def. 56.1 Ex. J.) The letter outlined the three incidents involving Thomas, Nordahl, and Wallig as the basis for the removal decision. (Pl. 56.1 Resp. ¶ 48; Def. 56.1 Ex. J.) Wallig was not formally disciplined for the April 22 incident. (Def. 56.1 Resp. ¶ 17.) Several days later, Hill sought EEO counseling, claiming that he was terminated due to discrimination based on his race, sex, age, and in retaliation for his prior EEO complaint. (Pl. 56.1 Resp. ¶ 49.) After receiving his right-to-sue letter from the EEOC, Hill brought suit in this Court alleging race discrimination, retaliation, and age discrimination. (Complaint ¶ 10).

## **STANDARD OF REVIEW**

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted by the opposing party, the Court will accept that statement as true for the purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an

unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir.

2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56

demands something more specific than the bald assertion of the general truth of a particular matter[;]

rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of

the matter asserted."). The non-moving party, therefore, cannot rely on mere conclusions and

allegations to create factual issues. *Bladerston v. Fairbanks Morse Engine Div. Of Coltec Ind.*, 328

F.3d 309, 320 (7th Cir. 2003). Nor can speculation be used "to manufacture a genuine issue of fact."

*Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citing *Amadio v. Ford Motor Co.*, 238

F.3d 919, 927 (7th Cir. 2001)).

## DISCUSSION

A plaintiff in a Title VII case may prove a claim of race discrimination or retaliation under

either the direct method of proof or the indirect method. *See Montgomery v. American Airlines*, 626

F.3d 383, 393 (7th Cir. 2010); *Weber v. Universities Research Ass'n*, 621 F.3d 589, 592 (7th Cir.

2010). Under the direct method, Hill must use either direct or circumstantial evidence to prove

GSA's employment decision was the result of discrimination. *Montgomery*, 626 F.3d at 393; *Phelan*

*v. Cook Cty.*, 463 F.3d 773, 779 (7th Cir. 2006). Though direct evidence "does not require a virtual

admission of illegality" or an explicit reference to the plaintiff's protected status, *Sheehan v. Donlen*

*Corp.*, 173 F.3d 1039, 1044 (7th Cir. 2009), it is typically found in the form of an admission by the

decision maker that he acted upon a discriminatory animus. *Phelan*, 463 F.3d at 779.

Circumstantial evidence generally comes in two forms: "(1) ambiguous statements or behavior

toward other employees in the protected group that taken together allow an inference of

discriminatory intent, and (2) evidence of systematically better treatment of employees outside the

9

protected class." *Montgomery*, 626 F.3d at 393 (7th Cir. 2010). Hill has offered no admissions that could be considered direct evidence of discrimination or retaliatory motive. Nor has he put forth evidence of ambiguous statements toward other employees in the protected group, or evidence that employees outside the protected class were systematically treated better. Therefore, the Court will analyze Hill's claims under the indirect method.

### I.    Race Discrimination

The indirect method of proof requires Hill to affirmatively establish a *prima facie* case of race and sex discrimination. *McDonell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To establish a *prima facie* case of race or sex discrimination under Title VII, Hill must prove (1) that he is a member of a protected class; (2) that he was meeting GSA's legitimate employment expectations; (3) that he suffered an adverse employment action; and (4) that GSA treated similarly situated employees not within Hill's class more favorably than they treated Hill. *Montgomery*, 626 F.3d at 394; *Weber*, 621 F.3d at 593; *LaFary v. Rogers Group, Inc*, 591 F.3d 903, 907 (7th Cir. 2010). If Hill is able to make out a *prima facie* case, the burden shifts to GSA to identify a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If GSA can meet that burden, summary judgment in its favor is proper unless Hill can show that GSA's proffered reason is simply pretext and that his race and gender were the real reasons for his termination. *Id.*

With respect to the first element, it is undisputed that Hill is a black male, and therefore a member of a protected class. (Pl. 56.1 ¶ 1.) Hill has also satisfied the third element by showing he suffered an adverse employment action, *i.e*, termination. (Pl. 56.1 Resp. ¶ 47.) GSA argues, however, that Hill is unable to prove the second and fourth elements of his *prima facie* case under Title VII. Specifically, GSA asserts that Hill cannot show he was meeting GSA's legitimate

10

employment expectations, or that GSA treated similarly situated non-black-male employees more favorably than they treated him.

### A. Performed Job According to Employer's Legitimate Expectations

In order to establish a *prima facie* case for race and gender discrimination under Title VII, Hill must demonstrate that he met GSA's legitimate employment expectations. *Weber*, 621 F.3d at 593. The undisputed facts reveal that he did not. An employee who routinely exhibits disrespectful behavior toward his peers and superiors is not satisfying his employer's legitimate employment expectations. *See, e.g.*, *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004) (an employee with a "persistent behavior and attitude problem" and "long history of volatile relations" with coworkers failed to meet defendant's legitimate employment expectations). In this case, Hill's pattern of aggressive behavior toward coworkers demonstrates that he was not meeting GSA's legitimate job expectations. On two separate occasions within a twelve-month period in two different GSA departments, Hill behaved in a manner that caused a male and a female coworker to feel so threatened by his behavior that they reported him to management. On a third occasion, which occurred within the same twelve-month period, Hill was involved in a verbal confrontation with a female contractor that prompted the contractor to notify Hill's superior. These three incidents, all of which were reported to management and ultimately formed the basis for GSA's decision to terminate Hill, show that Hill fell far short of meeting GSA's legitimate employment expectations.

Dwayne Thomas, Hill's team leader and mentor in the Communications Group, was the first GSA employee to report feeling threatened by Hill. Hill visited Thomas's cubicle in Fall 2008 because he was upset about not being selected for certain training opportunities. Thomas described Hill's tone as "loud and aggressive," and immediately ordered Hill to step away from his cubicle.

11

Both Thomas and Bruce Hall, Hill's supervisor, met separately with Hill to discuss the inappropriateness of his tone and demeanor. While Hill's probationary evaluation did not mention the incident with Thomas, the undisputed facts demonstrate that Hill was immediately made aware that the type of aggressive behavior he displayed toward Thomas was unacceptable and out of line with GSA's expectations. Nevertheless, Gabrish, who oversaw the FCIP, did not jump to the conclusion that Hill was entirely at fault. Instead, he assumed the conflict stemmed from personality differences and decided it would be best to rotate Hill to his next assignment.

Unfortunately, Hill's pattern of outbursts toward other employees did not change when he rotated to a new division in March 2009. Almost immediately after being transferred to Customer Projects, Marcy Nordahl, a contract employee, reported that Hill yelled at her after she refused to make color copies for him.[8] Just one month after that, Hill used an aggressive tone and intimidating physical stance toward Kristina Wallig, a fellow FCIP intern. Based on this pattern of combative behavior toward coworkers in what would otherwise be considered simple workplace conflicts, Hill cannot maintain that his performance was satisfactory.

Hill nevertheless argues that there is a factual dispute as to whether he was meeting GSA's legitimate expectations since Gabrish, the FCIP supervisor, never notified him that these incidents constituted unsatisfactory conduct. This argument is unconvincing, especially in light of the fact that Hill was repeatedly counseled about his aggressive behavior by the GSA supervisors who interacted with him on a daily basis. On at least five separate occasions, Hill either met or had telephone

---

[8]Hill disputes that his demeanor toward Nordahl was aggressive, and relies on an affidavit submitted by Clyde Branch, a CSS employee who was under Nordahl's supervision. (Pl. 56.1 Ex. D.) Branch observed Hill and Nordahl's first encounter, where Nordahl asked Hill to come back to CSS later in the day because she was busy making other copies. (Pl. 56.1 Ex. D, p.2.) Branch was not present when Hill returned a few hours later, which is when Nordahl alleges Hill lost his temper. Therefore, Branch's statement does not raise a factual dispute with regard to what transpired between Hill and Nordahl.

conversations with Thomas, Hall, McKenna, and Siegel, to discuss his behavior. Each of these individuals made it clear to Hill that his behavior was inappropriate and not in line with what GSA expected of him. Unlike Hill's supervisors, Gabrish did not directly oversee Hill's work or interact with him on a day-to-day basis. Therefore, it is not surprising that Gabrish was not directly involved in Hill's post-altercation counseling sessions. The fact that Gabrish did not personally sit down with Hill and communicate how multiple complaints of aggressive behavior could be grounds for termination does not raise a factual dispute over whether Hill was meeting GSA's legitimate expectations.

Hill's reliance on the lack of warnings or complaints in his written evaluations is equally unavailing. Whether a plaintiff had notice of his transgressions is irrelevant to the issue of whether he was meeting his employer's legitimate expectations. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 n.3 (7th Cir. 2007). The plaintiff in *Fane*, like Hill, pointed to satisfactory performance evaluations and the absence of disciplinary warnings after two incidents of interpersonal conflict as evidence that she was meeting her employer's legitimate expectations. *Id.*, at 540. The court rejected this argument, finding satisfactory performance evaluations insufficient to establish the plaintiff was meeting her employer's job expectations. *Id.* The situation in this case is strikingly similar. Hill asserts that his supervisors' failure to note his behavioral issues in his performance evaluations, all of which were satisfactory, is evidence that he was meeting GSA's expectations. The record does not support that position. An employee who is recognized for performing some aspects of his job well but is confrontational and disrespectful toward others is not meeting his employer's legitimate expectations. *Herron*, 388 F.3d at 300. Therefore, Hill's performance evaluations alone are insufficient to satisfy the second element of his *prima facie* case.

13

Because Hill has not shown that he was meeting GSA's legitimate job expectations, he cannot establish a *prima facie* case for race and gender discrimination under Title VII.

### B. Similarly Situated Employees

Hill also has not met his burden of identifying a similarly situated employee outside of his protected class who was treated better than him. In order to satisfy this element of his *prima facie* case, Hill must point to an individual that is "directly comparable to [him] in all material respects." *Burks v. Wisconsin Dept. Of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (quoting *Patterson v. Avery Dennison Corp.*, 281 F3d 676, 680 (7th Cir. 2002)). Factors relevant to this inquiry include: (1) whether the employees reported to the same supervisor; (2) whether they were subject to the same standards; and (3) whether they had comparable education, experience, and qualifications. *Burks*, 464 F.3d at 751. In addition, the similarly situated employee must display a "comparable set of failings" or have engaged in similar conduct without being subjected to the same disciplinary measures. *Id.* (finding that *prima facie* case was not met where plaintiff could not point to a coworker with a comparable set of failings). *See also Harris v. Warrick County Sheriff's Dept.*, 666 F.3d 444, 449 (7th Cir. 2012) ("To establish that employees not in the protected class were treated more favorably, the plaintiff must show that those employees were similarly situated with respect to performance, qualifications, and conduct."); *Herron*, 388 F.3d at 301; *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000) (explaining that the similarly situated employee must have "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them").

The only plausible candidate for a similarly situated employee in this case is Kristina Wallig, the white, female probationary intern involved in Hill's third incident. Hill submits that GSA's

14

decision to terminate him without disciplining or reprimanding Wallig is evidence of disparate treatment toward an employee who is not a member of his protected class. While there are some similarities between Hill and Wallig, Hill has not offered sufficient evidence to establish that Wallig is a similarly situated employee for the purposes of Title VII. Hill and Wallig were both hired on a probationary basis into GSA's two-year internship program, the only difference being that Hill rotated through different departments and Wallig did not. During Hill's rotation in Customer Projects, he and Wallig also reported to the same supervisor, Christine McKenna. Hill and Wallig's qualifications and level of experience are also comparable: both possess master's degrees and began working at GSA only two months apart.

The similarities end there; however, and Hill's efforts to compare Wallig to himself fall far short of what is necessary under the similarly-situated inquiry. Specifically, Hill has not shown that Wallig suffered from workplace failings that were comparable to his. Even if this Court found Wallig primarily at fault for the third incident, Hill has not offered any evidence that Wallig, like him, had a history of altercations with fellow employees during her probationary employment period. In fact, Hill does not point to a single instance where Wallig displayed aggressive or even impolite behavior toward an employee other than himself. While the similarly-situated inquiry does not require "near one-to-one mapping between employees . . . the employees receiving more lenient disciplinary treatment must at least share a comparable set of failings." *Harris*, 666 F.3d at 449. *See also Senske v. Sybase, Inc.*, 588 F.3d 501, 510 (7th Cir. 2009) ("Although the similarly situated concept is a flexible one, the comparators must be similar enough that differences in their treatment cannot be explained by other variables, such as distinctions in their roles or performance histories.") (internal citations omitted). For Wallig, the April 22 incident with Hill appears to have been her first

incident. Indeed GSA dealt with Wallig in a manner that was strikingly similar to the way it handled

Hill's first episode with Dwayne Thomas. Wallig, like Hill, was forced to have a meeting with her

immediate supervisor to discuss what had transpired. She was also asked to consider how she could

have handled the situation differently to avoid such a conflict in the future. Far from treating Hill

and Wallig differently, it appears that two different supervisors (Hall and McKenna) in separate

divisions of GSA responded to their employees' first interpersonal conflict situations in almost the

exact same way.

For Hill, however, the dispute with Wallig marked the third time in less than twelve months

where he had allowed his temper to flare against a coworker. As Hill's removal letter indicates, he

was terminated for engaging in "inappropriate conduct" towards Thomas, Nordahl, *and* Wallig. (Def.

56.1 Ex. J.) The differences between Hill and Wallig's behavioral histories render Wallig a poor

comparator for the purposes of the similarly-situated inquiry. Hill has failed to identify enough

common features between himself and Wallig to allow for a meaningful comparison that would lead

a jury to infer discrimination. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007),

*aff'd* 128 S.Ct. 1951 (2008). Accordingly, he cannot establish a *prima facie* case of discrimination.

### C.     Pretext

Even if Hill was able to satisfy the elements of his *prima facie* case, he is unable to

demonstrate that GSA's reason for terminating him—inappropriate conduct—was a pretext for

discrimination. To show pretext, Hill must prove that GSA's proffered reason for taking the adverse

action was dishonest and that the true reason was based on discriminatory intent. *Senske v. Sybase,*

*Inc.* 588 F.3d 501 at 507. If Hill cannot offer this evidence directly, he must present indirect

evidence challenging the credibility of the employer's reasoning. *Id.* This can be accomplished by

16

demonstrating "either that a discriminatory reason more than likely motivated [GSA] or that [its] explanation is unworthy of credence." *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998).

Hill cannot show that GSA's grounds for terminating him were factually baseless. Hill points to no evidence suggesting the complaints of intimidating and aggressive behavior by Thomas, Nordahl, or Wallig, were fabricated. Nor has Hill shown that Gabrish and Adams, the decisionmakers, manufactured those complaints to cover up unlawful discriminatory animus toward him. Hill asserts that Siegel, who was not in Hill's supervisory chain of command, viewed him as a "big black man" and repeatedly pressured Gabrish take action against him. While it is true that Siegel complained to Gabrish about Hill's outbursts and ultimately urged that something be done about Hill, Hill points to no evidence suggesting that Siegel's decision to lodge these complaints stemmed from a discriminatory bias against black men. Hill points to a meeting he had with Siegel after the altercation with Wallig, where Siegel warned Hill that he was a "big guy" and that stomping around and banging doors was intimidating to others. Hill maintains that from these statements, this Court should infer that Siegel would have viewed Hill's conduct differently if he was not a "big black man." (Pl. Brief, p. 12). The facts do not support this inference. Siegel's verbal assessment of how others perceived Hill's aggression mentioned Hill's size and demeanor, but not his race. Nor did Siegel's appraisal of why others were feeling threatened by Hill contain any racially charged undertones. Given that the purpose of the meeting with Siegel was to discuss how Hill had recently taken a physically intimidating stance toward a smaller female coworker, Siegel's discussion with Hill seems reasonable.

17

Furthermore, even if the evidence were to support that Siegel harbored some discriminatory bias toward Hill, Siegel was not a decisionmaker on Hill's termination.  In order to prevail, the plaintiff must "provide direct or circumstantial evidence that the *decisionmaker* has acted for a prohibited reason." *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 378–379 (7th Cir. 2011).  Statements of a nondecisionmaker "normally cannot provide the basis for a determination of discrimination." *Id.* at 379 (finding no pretext even where the evidence clearly supported the conclusion that the plaintiff's immediate supervisor harbored an illegal racial animus because the supervisor was "not the person who pulled the trigger to end [the plaintiff's] employment"). *See also Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998).  Hill has presented no evidence suggesting that Gabrish or Adams, the decisionmakers, decided to terminate Hill because he is a black male.

Nor can Hill prevail on a "cat's paw" theory of liability by imputing Siegel's alleged discriminatory animus to Gabrish.  Though Hill does not explicitly advance such a theory, he repeatedly urges that Siegel pressured Gabrish to take action against him.  "In employment discrimination cases, the cat's paw is the unwitting manager or supervisor who is persuaded to act based on another's illegal bias." *Schandelmeier*, 634 F.3d at 379.  To the extent that Hill relies on such a theory, this Court rejects it.  There is no evidence that Siegel tainted Gabrish's assessment of Hill's conduct.  Gabrish and Adams both testified that the termination decision was made after reviewing the witness statements from Thomas, Nordahl, and Wallig, and considering Hill's probationary status.

Hill further maintains that his behavior was not serious enough to warrant termination, but GSA was entitled to think otherwise. *See Grayson v. O'Neill*, 308 F.3d 808, 820 (7th Cir. 2002)

("[W]e are not concerned with the correctness or desirability of the reasons offered for employment decisions, but rather the issue of whether the employer honestly believes the reasons it offers."). Ultimately, Hill argues about "the merits, rather than the honesty of [GSA's] explanation, and thereby misses the point of the pretext inquiry." *Argyropoulos v. City of Alton*, 539 F.3d 724, 737 (7th Cir. 2008). It is not the place of this Court to decide whether GSA reached the *right* decision, so long as it was an *honest* one. *Grayson*, 308 F.3d at 820 ("[T]he federal anti-discrimination laws do not authorize judges to sit as a kind of 'super-personnel department' weighing the prudence of employment decisions.") (quoting *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1139 (7th Cir. 1997)). At the end of the day, the pretextual inquiry boils down to whether "the same events would have transpired if [Hill] had been [young and white] and everything else had been the same. *Senske*, 588 F.3d at 507 (citing *Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir. 1994)). Given Hill's history of aggression and his consistent failure to control his temper even when confronted with minor workplace conflicts, Hill cannot show that GSA's stated reasons for terminating him were pretext for racial for discrimination.

## II.    Retaliation

Hill also alleges that GSA's decision to terminate him was retaliation for filing an EEO complaint.[9] In order to prove retaliation under the indirect method, Hill must prove (1) that he was engaged in protected activity; (2) that he was subject to an adverse employment action; (3) that he

---

[9]Hill makes no effort in his response brief to defend his retaliation claim against GSA's motion for summary judgment. However, given that the retaliation claim still appears in Hill's original complaint, which he has not amended, this Court will assume Hill has not abandoned it or conceded that he cannot establish a *prima facie* case for retaliation. *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 964 n.1 (7th Cir. 2004) ("We have repeatedly made clear that perfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (citing *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)). Even addressing the claim, however, the claim fails.

was performing his job satisfactorily; and (4) that he was treated less favorably than similarly situated employees who did not engage in the protected activity. *Burks v. Wisconsin Dept. Of Transp.*, 464 F.3d 744, 759 (7th Cir. 2006); *Stone v. City of Indianapolis Pub. Utils Div.*, 281 F.3d 640, 644 (7th Cir. 2002). If GSA presents unrebutted evidence of a noninvidious reason for the adverse action, then it is entitled to summary judgment. *Stone*, 281 F.3d at 644.

Hill's retaliation claim fails for reasons similar to those discussed in parts I.A and I.B of this Opinion. Hill has satisfied only two of the four elements necessary to establish a *prima facie* case. Neither party disputes that Hill engaged in a protected activity, that is, filing a complaint with the EEO, and suffered an adverse employment action about a year later. However, for the reasons discussed above, Hill has not shown that he was performing his job at GSA satisfactorily. With respect to the fourth element, Hill has not identified a similarly situated employee who is "directly comparable in all material respects," let alone a similarly situated employee who did not engage in protected activity and was treated better than him. *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006) (quoting *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 561 (7th Cir. 2004)). Accordingly, Hill's retaliation claim cannot withstand summary judgment.

## CONCLUSION AND ORDER

For the foregoing reasons, GSA's motion for summary judgment is granted.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: September 27, 2012

20